H. V. Greene Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 3127.   Decided November 11, 1926.

1. During 1919 petitioner had contracts whereby it was obligated to sell the entire stock issues of other companies at such an amount as would net the issuing company a stated amount per share, the difference between said stated amount and the price at which the stock was sold representing petitioner's commission. This commission was payable out of the first money paid by the subscriber. No stock was issued or delivered until the subscriber had fully paid therefor. Subscribers who did not desire to pay the entire purchase price in cash were permitted to pay 20 per cent in cash and give promissory notes payable monthly for the balance. In such cases the subscription contract provided (1) that should the subscriber become ill or die the installments paid would be refunded to him or his estate and the remaining installments canceled; (2) that should the subscriber become dissatisfied with his purchase before he had completed the payments he could cancel the contract and receive back the amount paid less 7½ per cent for expenses; (3) that upon application of the subscriber a reasonable extension not exceeding 90 days would be granted for the payment of installments; and (4) that if a subscriber failed to pay the installments when due, and such default continued for 30 days, the issuing company might at its option cancel the subscription contract and all rights of the purchaser thereunder. The petitioner sold many shares of stock during 1919, and on December 31 of that year commissions totaling $311,573.75 on the sale of 24,180 shares of stock were eliminated from gross income for the reason that subscribers for those shares were 60 days or more in arrears with one or more of their installment payments, and for the further reason that it might become necessary for petitioner to resell these shares. The petitioner kept its books upon the accrual basis. *Held*, that the Commissioner properly included the $311,573.75 in gross income for 1919.

2. Petitioner, a stock-selling organization, by proper resolution fixed the compensation of its officers at a stated amount per month and authorized the payment to them of a certain commission upon the sale of stock of other corporations. *Held* that, in the circumstances, such compensation was reasonable and constituted a proper deduction from gross income.

3. Petitioner and five other corporations were affiliated during the year 1919.

*W. W. Spalding, Esq.*, for the petitioner.
*J. Arthur Adams, Esq.*, for the respondent.

This proceeding involves income and profits taxes for the calendar year 1919 in the amount of $270,711.60.

The petitioner, a stock-selling organization, advances four claims as follows: (1) That it should be permitted to adjust its books at

the end of the year so as to exclude from gross income commissions totaling $311,573.75 upon the sale of stock of other corporations during the year, upon the ground that under the terms of its underwriting contracts that amount of commissions was unearned. The Commissioner refuses to permit it to do this. (2) That the Commissioner erred in refusing to allow it to deduct, as a part of the compensation for its president and vice president, $241,505.78 representing the total commissions paid to its president and vice president. The Commissioner allowed the petitioner to deduct compensation of $26,000 for its president and $5,777.76 for its vice president. (3) That the Commissioner erred in declining to permit petitioner and five other corporations to file a consolidated return. (4) That petitioner's profits tax should have been determined under the provisions of section 328 of the Revenue Act of 1918.

FINDINGS OF FACT.

Petitioner was organized on January 5, 1918, to engage in the business of promoting and selling stock of finance corporations, with principal office at Boston, Mass. About 1917, Henry V. Greene perfected plans for the organization of corporations and trusts to carry on a general banking business, to finance automobile sales and to deal in manufacturers' open book accounts, and for the organization of another corporation, the petitioner herein, to sell the stock issues of these corporations. About October, 1917, he organized the Commercial Finance Corporation. On December 28, 1917, Greene, party of the first part, and this corporation, party of the second part, entered into the following agreement:

Whereas the said party of the second part is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with an authorized capital of two million dollars, consisting of one million dollars par value of seven per centum cumulative preferred stock, participating as to dividends and preferred as to assets on liquidation to its par value and accumulated dividends, and one million dollars par value of common stock, each of said classes of stock being divided into twenty thousand shares of the par value of fifty dollars each, and all of which said preferred stock is to be offered for public subscription.

And whereas the said party of the first part is engaged in the business of offering for sale to investors and others the securities of corporations.

Now, therefore, in consideration of the issuance to the said party of the first part of nineteen thousand nine hundred ninety-six shares of the said common stock of the said party of the second part, the said party of the first part agrees to underwrite said preferred stock at the price of forty-seven dollars and fifty cents per share, one-half the amount of the differnce between said underwriting price and the price at which the said stock is sold is to be paid in cash by said party of the second part to said party of the first part upon the receipt of each installment subscription to said stock, the balance to be paid weekly or monthly as paid in by subscriber.

Where the amount of the cash payment equals or exceeds the amounts due said party of the first part under this agreement, then the entire sum so due shall at once be paid in full by said party of the second part.

It is hereby agreed that any and all sums received by the said party of the first part for or on account of subscriptions to said preferred stock shall be promptly paid over to the said party of the second part.

It is hereby agreed by the said Henry V. Greene that he will not engage in the marketing or the promotion of any other proposition during the space of six months from the date of this instrument.

In witness whereof the day first above written, the said Henry V. Greene does hereto set his hand and seal and the said Commercial Finance Corporation, by its President duly authorized, does hereto set its hand and affix its corporate seal.

On January 5, 1918, Greene executed the following assignment of this contract to the petitioner:

Know all men by these presents that I, the undersigned, Henry V. Greene, in consideration of the issuance to me of 1,200 shares of the capital stock of the H. V. Greene Company, do hereby sell, transfer, assign to H. V. Greene Company all of my title and interest in and rights under the agreement hereto attached, expressly reserving to myself, however, free from the operations of this assignment, the common stock of Commercial Finance Corporation issued to me in connection with the said agreement.

That I hereby authorize and empower the said H. V. Greene Company upon its performance of the conditions and covenants therein mentioned to demand, enforce and receive all relief concerning the same to obtain in the same manner, to all intents and purposes, as I myself could do with these presents not executed.

At a meeting of the petitioner's directors on December 10, 1918, the following proceedings were had:

The president, H. V. Greene, read to the directors a contract entered into between himself and the Commercial Finance Corporation to underwrite a new issue of 40,000 shares of the preferred stock of that corporation, and, after discussion, upon motion duly made and seconded, it was voted that H. V. Greene Company assume and take over the rights and liabilities of H. V. Greene under the said underwriting agreement;

Whereupon, Mr. Greene executed to the corporation an assignment of said contract.

In 1918, Greene organized the Mutual Finance Corporation, and on September 26, 1918, Greene, as party of the first part, and this corporation, party of the second part, entered into the following contract:

Whereas, the party of the second part is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with an authorized capital stock of one hundred thousand dollars ($100,000), consisting of eighty thousand dollars ($80,000) par value seven per centum (7%) cumulative preferred stock, participating as to dividends and preferred as to assets on liquidation to its par value and accumulative dividends and twenty thousand dollars ($20,000) par value of common stock, each of the said classes of stock being of the par value of $50.00 per share and all of which preferred stock is to be offered for public subscription.

Whereas, the said party of the first part is engaged in the business of offering for sale to investors and others the securities of corporations.

Now, therefore, in consideration of the issuance to the said party of the first part of the three hundred and ninety-seven (397) shares of the said Common Stock of the said party of the second part, said party of the first part agrees to underwrite said preferred stock at a price of fifty dollars ($50.00) per share to be paid in cash or promissory notes to the said party of the second part as and when the said preferred stock shall be sold.

In witness whereof on the day first above written, the said Henry V. Greene does hereto set his hand and seal and the said Mutual Finance Corporation, by its President duly authorized, does hereto set its hand and affix its corporate seal.

At a meeting of the petitioner's directors on October 10, 1918, the following proceedings were had:

The president laid before the directors the contract between himself and the Mutual Finance Corporation to underwrite the preferred stock of said Mutual Finance Corporation, and outlined the desirability of having his interest in said contract taken over and assigned by the company. After discussion, and upon motion duly made and seconded, it was voted to approve the terms of said contract to take over and assign the interest, rights, and liabilities of Henry V. Greene, with the exception of any title and interest in any common stock of the Mutual Finance Corporation issued to Henry V. Greene in connection with the original execution of said contract, and to issue therefor to Henry V. Greene 100 shares of the preferred stock of the H. V. Greene Company upon receipt of a proper assignment as herein stated on said contract, said stock to be so issued at par.

On the same day Greene executed an assignment of this contract to the petitioner in the same form as that relating to the assignment of the Commercial Finance Corporation's contract above quoted.

On May 19, 1919, Greene, party of the first part, and the Mutual Finance Corporation, party of the second part, entered into the following contract relating to the sale of the second issue of preferred and common stock:

(1) Whereas the said party of the first part is engaged in the business of offering for sale the securities of corporations and has acquired several thousand clients who are satisfied with the investments they have already made and therefore offer a field for quick distribution of large stock issues: and

(2) Whereas the said party of the second part is a corporation organized under the laws of the Commonwealth of Massachusetts with an original capitalization of $100,000.00 all of which has been subscribed: and

(3) Whereas the said capitalization being insufficient to do business on lines importing a great success, the said party of the second part has voted to increase its capitalization by 60,000 shares of 8% Preferred and 40,000 shares Common Stock, both of the par value of $50.00: and

(4) Whereas the said party of the second part has no facilities for the placing of its preferred stock in such a manner as to benefit the corporation:

(5) Now THEREFORE, in consideration of these presents and in further consideration of the issuance to the said party of the first part of 40,000 shares of the common stock of the said party of the second part, the said party of the first part, for himself or his assigns, hereby agrees as follows:

(a) That he will sell or cause to be sold the entire issue of the preferred stock (60,000 shares) of the said party of the second part at such price as will net the corporation a sum not less than $51.25 for each share thereof;

(b) That he will give as a bonus to each and every purchaser of the said preferred stock, a trust certificate for one share of common for every two shares of preferred stock so purchased;

(c) That he will give to all holders of the original issue of preferred stock, as hereinbefore set forth, a trust certificate for a full share of common stock for each two shares of preferred stock of said original issue, so held;

(d) That whenever any of the said preferred stock shall be sold for cash, the said sum of $51.25 shall forthwith be remitted to the said party of the second part, for each and every share so sold;

(e) That whenever any of the said preferred stock shall be sold other than for cash, where the amount of the cash payment on account exceeds the amount of the difference between the above mentioned net price and the price at which said stock shall be sold, then the said party of the second part is to remit forthwith to the party of the first part the total amount of his commission due thereunder.

(f) That whenever any of the said preferred stock shall be sold other than for cash, where the amount of the cash payment on account is less than the total amount of commission due the said party of the first part, for said sale, then the said party of the second part shall remit forthwith to the party of the first part an amount which shall equal 5/6 of the commission due to the said party of the first part hereunder and shall remit the remaining 1/6 out of the next payment made by the client under said sale.

(6) It is hereby understood and agreed by both the parties hereto that all the terms and conditions of this sales contract appear in the within agreement.

This contract was duly assigned by Greene to the petitioner.

At a directors' meeting held June 10, 1919, the following resolution was adopted:

Upon motion duly made and seconded, it was voted that the commissions secured from the sales of Mutual Finance Corporation's stock under a contract of the H. V. Greene Company with said Mutual Finance Corporation, be divided as folows:

Salesmen 10 per cent, managers 5 per cent, superintendents 1½ per cent, general manager 1½ per cent, president, H. V. Greene, 10 per cent, H. V. Greene Company the remainder.

All of the foregoing per cents being based on the par value of the stock.

Mr. Greene called the attention of the Board to his desire to have the amount of his compensation spread upon the minutes of the company that they may be recorded in due form.

On motion duly made and seconded, it was provided that the salary of H. V. Greene shall be, until otherwise voted, $500 per week, together with any bonus or commissions that may be voted him from time to time.

At a meeting on December 26, 1919, the petitioner's directors adopted the following resolution:

On motion by Mr. Campbell, duly seconded, it was voted that the corporation pay to Henry V. Greene as additional bonus for his service in connection with

the sale of Mutual Finance Corporation stock the sum of $1.75 for each share of preferred stock of said corporation so sold.

The First People's Trust was organized on October 28, 1919, and on October 30, 1919, J. Henry Neal et al., trustees, as parties of the first part, and Henry V. Greene, as party of the second part, entered into the following contract:

THAT WHEREAS, in accordance with the plan of organization referred to in said Declaration of Trust, said Trust proposes to sell One Hundred Ninety Thousand (190,000) first preferred shares, One Hundred Ninety Thousand (190,000) second preferred, and One Hundred Ninety Thousand (190,000) common shares of said First People's Trust through the agency of said Greene.

Now THEREFORE, in consideration of the premises and the mutual promises herein contained, it is agreed by and between the parties hereto as follows:

1. Said Trust covenants and agrees to issue or transfer, or cause to be issued or transferred, to said Greene Ten Thousand (10,000) common shares of said Trust in consideration of the undertaking on the part of said Greene hereinafter set forth.

2. Said Greene undertakes to sell One Hundred Ninety Thousand (190,000) shares first preferred, One Hundred Ninety Thousand (190,000) shares second preferred, and One Hundred Ninety Thousand (190,000) common shares of said First People's Trust in blocks consisting of two first preferred shares, two second preferred shares and two common shares in each block at a price to net the Trust Two Hundred Dollars ($200) for each block of shares as aforesaid.

3. Said Greene shall have the right to fix the price in excess of Two Hundred Dollars ($200) at which each block of shares aforesaid shall be sold, and said Trust agrees to pay to said Greene as commission the excess above Two Hundred Dollars ($200) received for each block of shares sold as aforesaid, the evidence of such sale to be a subscription agreement validly executed by the purchaser thereunder. Said Greene shall receive no other commission or any compensation from said Trust for expenses or otherwise except as provided herein.

4. Said shares are to be sold in accordance with the terms of subscription agreement, copy of which is hereto attached, and all payments under said subscription agreement are to be made to the First People's Trust. The commission to which the said Greene is entitled under this contract shall be paid to said Greene or his order from the first payment made by the purchaser under said subscription agreement, and shall not be payable until said first payment is made, it being understood that said first payment shall be at least sufficient to pay said commission.

5. Until this contract is revoked in writing by the parties hereto, said Greene shall have the sole and exclusive agency for the sale of said shares of the First People's Trust as hereinbefore set forth.

Soon after the execution of the above contract it was assigned to the petitioner by Greene, whereupon the directors voted to pay Greene a commission of $1.25 a share on the stock of this corporation.

During 1918 and 1919 petitioner marketed the stock of the aforementioned corporations. The system of selling stock devised for the petitioner by Greene, its president, contemplated the wide distribution of the stock to the public through an extensive organization of salesmen, district managers, general sales managers, and executive

officers. Branch offices were opened in the more important cities of the United States. Training schools for salesmen were established at which the more recently employed stock salesmen were instructed and the experienced salesmen enthused over the work at hand. Sixty branch offices were established and 1,800 salesmen were employed. The stock of the three corporations sold in 1918 and 1919 amounted to several millions of dollars.

No stock was issued or delivered to any subscriber until he had fully paid for the shares for which he had subscribed. Subscribers were given the option of paying for the stock in full at the time of the signing of the contract, by which they agreed to purchase so many shares at a specified amount, or of paying 20 per cent in cash and the remainder in monthly installments. Non-interest-bearing promissory notes were given for the unpaid installments. All installment contracts between the issuing company and the purchaser of the stock provided, first, that if the purchaser should fail to make any of the installment payments when due and such default should continue for 30 days, the issuing company might at its option cancel the subscription contract; second, that upon written request of the purchaser within one week from the date of such default the issuing company would grant a reasonable extension on installments in arrears, not exceeding three months; third, in case of the death of the purchaser before the amount subscribed had been fully paid, the issuing company would pay to the purchaser's estate the full amount paid in; fourth, should the purchaser become dissatisfied with his contract before the installments had been fully paid, all amounts paid in by him, less 7½ per cent for expenses, would be refunded.

All cash, subscription contracts, and notes received by salesmen were transmitted direct to the company the stock of which had been sold, and daily reports were made by branch managers to the petitioner of the sales made during the preceding day. The issuing companies maintained upon their books an account in the name of each person who had signed a contract to purchase stock showing payments, etc. The petitioner did not maintain such accounts upon its books. Upon receipt by the petitioner of the daily reports of sales made, it forthwith, upon its books, charged the company the stock of which had been sold with the total commission upon the stock sold and credited the commission account. The companies whose stock was being sold made remittances to the petitioner of the commissions to which it was entitled under the contracts out of the first money received from the purchaser of the stock.

The number of shares sold by the petitioner during the year 1919, after eliminating subscription contracts which had been definitely canceled, and the commissions of H. V. Greene thereon, were as follows:

|  | Net shares sold. | Rate. | Amount of commission. |
|---|---|---|---|
| Commercial Finance Corporation | 35,627 | $.50 | $17,813.50 |
| Mutual Finance Corporation | 62,011 | 2.75 | 170,530.25 |
| First People's Trust | 37,436 | 1.25 | 46,795.00 |
| Total | 135,074 | -------- | 235,138.75 |

At the end of 1919 certain purchasers of stock were in arrears with their installment payments. The petitioner examined the books of the companies the stock of which it was selling, carefully scrutinizing each contract and the account of each purchaser of stock, and made a list of the number of shares of stock which had been sold as to which the purchasers were 60 days or more in arrears with one or more of their installment payments. This examination showed that purchasers of 11,910 shares of the stock of the Commercial Finance Corporation and of 12,270 shares of stock of the Mutual Finance Corporation were 60 days or more in arrears with one or more installment payments. The petitioner's commissions upon these shares amounted to $311,573.75. Whether all or any portion of the petitioner's commissions upon these shares had been paid to it is not shown. Neither the purchaser of any of these shares nor the issuing company had evidenced a desire to cancel any of the contracts.

On December 31, 1919, petitioner debited its commission account with $311,573.75 and credited the Commercial Finance Corporation with the amount of the commission upon 11,910 shares and the Mutual Finance Corporation with the commission on 12,270 shares, the two credits totaling $311,573.75. The explanation of the entry made upon the journal at the time was as follows:

To credit the Commercial Finance Corporation and the Mutual Finance Corporation for the commissions on sales of stock. All of the sales, on which the above commissions were computed, were made to subscribers who were at least 60 days in arrears on their payments on December 31, 1919. These contracts are known to be worthless and the stock will have to be resold.

No adjustment was made of commissions on stocks sold as to which the purchaser was delinquent in his installment payments for less than 60 days.

On September 30, 1920, petitioner desired to show a large book net worth and, without making any further examination of the delinquent accounts, debited the Commercial Finance Corporation and the Mutual Finance Corporation with the amounts previously credited to them and credited the commission account with $311,573.75, thereby reversing the entry of December 31, 1919.

Greene was primarily responsible for the petitioner's activities. He formulated all of its plans of operations and supervised and di-

rected the carrying out of those plans. Every employee worked under his supervision. He labored long hours each day and was constantly planning for the success of the company and urging others to greater efforts. He edited and published a "House Organ," having for its purpose the success of the company through greater effort and better salesmanship on the part of employees and salesmen. Petitioner's entire income consisted of commissions on stock sold, and for the year 1919 was in excess of $2,000,000. After deducting all expenses, including commissions paid to salesmen of $103,655.77, to branch managers of $349,361.50, to sales directors of $113,183.50, and to district superintendents of $120,293, and after eliminating from gross income the alleged unearned commissions totaling $311,573.75, and, also, after deducting $229,691.03 commissions paid or credited to Greene and A. D. Howard, petitioner's return for 1919 showed a net income of $84,441.31, or 138 per cent return on invested capital of $61,170.16.

The petitioner kept its books and rendered its returns upon the accrual basis. The total compensation paid to H. V. Greene, president and treasurer, for 1919 amounted to $249,324.04, consisting of a fixed salary of $26,000 and commissions upon stock sold of $223,524.

A. D. Howard was a director and vice president and devoted his entire time to petitioner's business. With the exception of one qualifying share, he owned no stock of the petitioner. His total compensation for the year 1919 amounted to $12,144.79, consisting of a fixed salary of $5,777.76 and commissions on stock sold of $6,367.03. The Commissioner allowed the deduction of Howard's fixed compensation but disallowed the commissions paid to him.

Commissions were paid upon stock sold during the year 1919, as follows: Salesmen, 10 per cent; branch managers, 5 per cent; district superintendents, 2½ per cent; sales directors, 1½ per cent.

The petitioner filed a consolidated return with L. W. Westcott, Inc., hereinafter designated the Westcott Company; Backus Heater & Foundry Co., hereinafter designated the Backus Company; California Carbon Co., hereinafter designated the Carbon Company; Southern Labrador Pulp & Lumber Co., hereinafter designated the Lumber Company; and the College of the Spoken Word, hereinafter designated the College Company. The petitioner claimed that its stock and the stock of the corporations named above was owned or controlled during 1919 by the same interests, namely, H. V. Greene, president of the petitioner. The Commissioner denied the right to affiliation. The preferred stock of the corporations had no voting rights.

At the beginning of 1919, H. V. Greene owned 99.98 per cent of the stock of the Westcott Company and 99.2 per cent of the stock of the Backus Company.

In the Carbon Company he owned 7,497 shares, or more than 99 per cent of the outstanding stock. In 1919 there were issued to H. V. Greene 37,497 additional shares of stock of the Carbon Company.

The College Company was organized June 7, 1919, and throughout the remainder of that year H. V. Greene owned 99.8 per cent of its stock.

The Lumber Company was organized September 8, 1919, and throughout the remainder of that year H. V. Greene owned 99.8 per cent of its stock.

H. V. Greene owned 70.5 per cent of the petitioner's stock; the minority interest was owned as follows: Alice Fowler, 100 shares; Mary Warren, 100 shares; Marjorie Mayo, 100 shares; N. R. Black, 50 shares; Lillian Coleman, 85 shares; A. D. Howard, 1 share; E. C. Campbell, 101 shares; H. B. Robinson, 100 shares, and W. C. Burns, 100 shares.

The stockholders at the end of 1919 were as follows:

In the Westcott Company there was no change during the year.

In the Backus Company—H. V. Greene, 51 per cent; F. Liston Collins, 5 per cent; F. E. Backus, 37.5 per cent; and A. L. West, 6.3 per cent. Collins and West were employees of the petitioner. The certificates of stock in the Backus Company were written up and reserved for them but the title thereto did not pass from the company. The future ownership of this stock was offered as an inducement to them to make a market for the product of the Backus Company. In this they were unsuccessful and the stock was never issued or delivered to them. The same was true in respect of the stock reserved for but not issued to Backus. All of the outstanding stock of the Backus Company during 1919 was therefore owned by H. V. Greene.

In the Carbon Company, the College Company, and the Lumber Company, the stock was owned at the end of the year by H. V. Greene in the same proportion as at the beginning of the year. The stockholdings in the petitioner company were substantially the same at the end as at the beginning of the year. There were certain changes which will be referred to hereafter.

Pursuant to a provision in its charter, the stock certificates of the petitioner contained the following indorsement:

No stock of this corporation shall be transferred upon the books of the corporation unless it shall appear that prior to the sale thereof by the stockholder, such stock was in writing offered for sale to the corporation at par. If it shall appear that said stock was so offered for sale to the corporation, and offer was not accepted within fifteen days from the date of offer, then said stock may be otherwise sold and transferred.

Early in 1918, H. V. Greene, having optimistic ideas and definite plans for selling the stock of the finance corporations but no capital for this purpose, approached H. B. Robinson, an investor, with the

proposal that Robinson lend him $1,000 for which he, Greene, would issue to Robinson stock of the petitioner having a par value of $1,000; that upon Robinson's demand Greene would repay to him the amount so advanced; that Greene should have the right to repay the loan at any time and to reclaim the stock, and that Robinson's profit on the transaction would be the dividends on the stock, which it was contemplated would be large during the period the stock stood in his name.   This proposal was accepted by Robinson.   He also made the same arrangement with Greene for one of his, Robinson's employees and his nieces, Mary R. Warren, Marjorie R. Mayo, Nellie R. Black, and Alice M. Fowler.

The same arrangement was made by Greene with E. C. Campbell and Walter Burns.   It was the purpose of Greene to issue no stock of the petitioner which could not be repurchased by him at any time he might wish to do so.

The arrangement concerning the repurchase of the stock of the individuals named was carried out in December, 1919, except as to the stock of Nellie R. Black and H. B. Robinson.   At the close of 1919, Greene owned all of the stock of the petitioner, except 50 shares standing in the name of Nellie R. Black, 100 shares in the name of H. B. Robinson, 1 share in the name of A. D. Howard, and 3 shares in the name of F. Liston Collins.   The total outstanding stock of the petitioner was 2,500 shares.

At all meetings of stockholders in 1919, H. V. Greene, with the exception of qualifying shares in the names of the other directors, voted all of the stock of the petitioner pursuant to proxies given him by the minority stockholders.   The voting of the stock and the entire management of the company was left in his hands by the stockholders and the board of directors.   As to the other companies, all of them except the Carbon Company had their offices in the offices of petitioner, where their books of account were kept by petitioner's employees at its own expense.   The meetings of their stockholders were held in petitioner's offices.   The several companies mentioned were financed by the petitioner and H. V. Greene individually. The officers and directors of petitioner and of the other companies were interlocking.   The activities of all were directed by the officers of the petitioner.

In 1919 the following profits or losses were earned or suffered by the companies claimed to have been affiliated with the petitioner:

| | Loss. | Profit. |
|---|---|---|
| Backus Heater & Foundry Co | $25,736.27 | |
| California Carbon Co | 8,891.74 | |
| L. W. Westcott, Inc | | $398.84 |
| Southern Labrador Pulp & Lumber Co | 3,262.31 | |
| College of the Spoken Word | | 1,302.23 |

## OPINION.

LITTLETON: The position of the petitioner is that the commissions to which it was entitled under its contracts with the companies the stock of which was being sold, were not earned until all installment payments had been completed by the purchaser, and that the method adopted by it of eliminating from gross income all commissions on stock sold, as to which the purchaser was 60 days or more in arrears with one or more of his installment payments, was correct. It is argued that under the terms of the underwriting contracts petitioner was not entitled to claim as its own any commission until full and complete payment for the stock which it had sold had been made. It appears that under the underwriting contracts petitioner's commission was payable out of the first payments made by the subscriber. It is insisted, however, that notwithstanding the fact that when the payments made at the time of the subscription contract, or prior to the end of the year, equaled or exceeded the amount of the petitioner's commission, and that it had the right to charge the issuing company with the commission, the petitioner was still " under duty to see to it that the subscriber completed his payments and that the stock was actually sold, because petitioner had received compensation for making that particular sale and until the stock was paid for there was no completed sale—no stock was issued or delivered. Moreover, petitioner had by written contract agreed to underwrite the entire issue—to place the entire issue at a stipulated amount—and where a subscriber became delinquent, or he did not comply with his contract, there was only one thing for petitioner to do, and that was to resell the stock."

By reason of this situation it is claimed that the method adopted by the petitioner of determining its income by eliminating therefrom commissions on shares sold, but as to which the purchaser was 60 days or more in arrears with his payments, should be approved.

The method adopted by the petitioner in respect of unearned commissions is not essentially different from the setting up of a reserve for future contingencies, which is unauthorized in cases of this kind by the Revenue Act of 1918. *Appeal of William J. Ostheimer,* 1 B. T. A. 18; *Appeal of Consolidated Asphalt Co.,* 1 B. T. A. 79; *Appeal of Uvalde Co.,* 1 B. T. A. 932; *Thomas Cronin Co. v. Lewellyn,* 9 Fed. (2d) 974; *Appeal of Pan-American Hide Co.,* 1 B. T. A. 1249; *Appeal of Morrison-Ricker Mfg. Co.,* 2 B. T. A. 1008; *Appeal of Thatcher Medicine Co.,* 3 B. T. A. 154; *Appeal of Greenville Coal Co.,* 3 B. T. A. 1323.

It is not claimed by the petitioner that an amount equal to or in excess of its commissions had not been paid by the subscriber. Neither the company the stock of which had been sold nor the

subscriber had indicated any intention of canceling the subscription contract, and the evidence does not warrant the conclusion that either was likely to do so. The petitioner excluded from income commissions on shares in respect of which the subscription contract had been canceled and which shares had not been resold, and the Commissioner does not question this.

The Board is of the opinion that the commissions, totaling $311,573.75, constituted income within the meaning of the statute, and the action of the Commissioner in increasing the income in that amount is approved.

The next question relates to the disallowance by the Commissioner of $229,691.03, claimed as a deduction as part of the compensation paid to Greene and A. D. Howard in the form of commissions on stock sold during the year. Two hundred and twenty-three thousand three hundred and twenty-four dollars of the amount represented commissions paid to Greene in addition to his fixed compensation of $26,000, and $6,367.03 represented commissions paid to Howard in addition to his fixed compensation. The amount of commissions due Greene on the total net shares sold during 1919 was $235,138.75, which brings into issue the propriety of a deduction of $241,505.78 as a part of the compensation of these two officers.

The compensation of the officers was duly and regularly fixed by resolutions of the directors and was duly paid or credited to them. Two hundred thousand dollars or more of Greene's compensation was paid to him and he reported the same in his tax return. Howard's total compensation was paid to him. The compensation of officers was authorized without consideration of their stock ownership. It was predicated entirely upon the value placed by the directors upon the services rendered and to be rendered during the year. Howard was vice president and a director and owned only one qualifying share of stock. He devoted his entire time and energy to the conduct of the petitioner's business and, as an aid to Greene, he was instrumental in the success of the company. F. Liston Collins, who owned only three shares of stock, was a sales director and was paid commissions amounting to $113,183.50. This amount was deducted by the petitioner and allowed by the Commissioner without question. Compensation in the form of commissions paid to salesmen, sales directors, branch managers, and district superintendents, only one or two of whom owned a small amount of petitioner's stock, appears to equal, in comparison with the value of the services rendered to the petitioner, the compensation paid to Greene. No question is raised as to the deduction claimed for compensation paid to any one other than Greene and Howard.

Greene organized the three finance corporations and procured the contracts for the sale of their stock to which petitioner's income was

entirely attributable. He formulated and was largely responsible for the success and plans adopted by the petitioner. He devoted all of his energies to the business for the greater portion of time long after the usual working hours. The policies of the company represented merely the embodiment of his ideas. The responsibility of solving its problems as they arose devolved upon him.

The reason given by the Commissioner for the disallowance of the deduction of commissions paid to Greene and Howard in the notice of the deficiency mailed to the petitioner was as follows:

Commissions paid to officers are tentatively disallowed in the absence of copy of agreement, or other evidence showing authorization, how computed, etc. However, due consideration will be given to any information you may desire to submit tending to prove the correctness of the deduction, provided same is submitted within the time limit prescribed by Section 274 of the Revenue Act of 1924.

At the hearing, and after the petitioner had proved the authorization of the salaries and the character of services rendered, the Commissioner insisted that the compensation paid to Greene and Howard was unreasonable and represented a distribution of profits. In support of this claim the Commissioner pointed to the fact that Greene's income from other activities in years prior to 1918 was small in comparison with the amount paid him by the petitioner in 1919. We do not consider this as proof that Greene's services to the petitioner during the taxable year were not worth what it paid him. Although the compensation paid was large, we find no sufficient evidence to justify the conclusion that the amount paid, or any portion thereof, represented a distribution of profits in the guise of compensation. In view of the evidence the Board can not, in justice, say that the value which the corporation placed upon Greene's services was unreasonable. No reason was advanced as to why the compensation paid Howard was considered unreasonable. We think it was not.

The Board is of the opinion that the compensation of $235,138.75 paid to Greene and $6,367.03 paid to Howard should be allowed as deductions from gross income.

We are of the opinion from the evidence that H. V. Greene owned and controlled substantially all of the stock of the petitioner and the other corporations mentioned. The minority stock in the petitioner corporation was held by persons who had received it under a contract providing that Greene might repurchase it at any time; they took no interest in the affairs of the corporation; he always voted the minority stock. The minority stock was at all times under the control of H. V. Greene. Had there been the slightest indication of opposition by the minority stockholders, it would only have been necessary for Greene to repay the loan, which he was at all times able to do, and take over the stock. In these circumstances, we are of

the opinion that he controlled the outstanding minority stock of the petitioner. Greene owned more than 99 per cent of the outstanding stock of the other corporations and they were therefore affiliated with the petitioner.

The statutory invested capital of the petitioner for 1919 was $61,170.16. It is claimed that its profits tax should be computed under the provisions of section 328 of the Revenue Act of 1918. However, in view of our decision that the net income and invested capital of the petitioner and the other corporations mentioned should be computed upon the basis of a consolidated return, it is unnecessary to pass upon this question.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

MILLIKEN and STERNHAGEN concur in the result only.